IN THE DISTRICT COURT OF GUAM

TERRITORY OF GUAM

UNITED STATES OF AMERICA,   )Criminal Case No. 13-00063-001
   )
           Plaintiffs,  )
   )
           vs.      )
   )
KENNETH FREDRICK CALVO, and   )
CLYDE STREETER III,   )
   )
           Defendants.  )

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE FRANCES TYDINGCO-GATEWOOD,
CHIEF JUDGE
SEPTEMBER 4, 2014; 2:35 P.M.
HAGATNA, GUAM

**Sentencing**

Proceedings recorded by *mechanical stenography*, transcript produced by computer.

Veronica F. Flores, CSR-RPR
Official Court Reporter
520 W. Soledad Avenue
Hagatna, Guam 96910

APPEARANCES


Appearing on behalf of plaintiff:


**OFFICE OF THE UNITED STATES ATTORNEY**
**BY: ROSETTA SAN NICOLAS, AUSA**
Suite 500, Sirena Plaza
108 Hernan Cortez Avenue
Hagatna, Guam 96910
(671) 472-7332


Appearing on behalf of defendant:


**LAW OFFICES OF CUNLIFFE & COOK**
**BY: JEFFREY MOOTS, ESQ.**
Suite 200, 210 Archbishop Flores Street
Hagatna, Guam 96910
(671) 472-1824


ALSO PRESENT:

Kenneth Calvo, Defendant

Jeffrey Ventura, Probation

Margarita Wonenberg, Probation (via telephone)

Erfel Matanguihan, Homeland Security


-----------------------------------------------------

I N D E X


                                                  Page

Defendant committed to Bureau of Prisons
for a period of the 108 months                     57

Veronica F. Flores, CSR-RPR
Official Court Reporter
520 W. Soledad Avenue
Hagatna, Guam 96910

1              **September 4, 2014; 2:35 p.m.; Hagatna, Guam**

2                              * * *

3

4              THE CLERK:  Criminal Case No. 13-00063, *United*

5    *States of America versus Kenneth Fredrick Calvo*; Sentencing.

6              Counsel, please state your appearances.

7              MS. SAN NICOLAS:  Buenas and hafa adai, Your

8    Honor.  Rosetta San Nicolas on behalf of the United States.

9    To my left is Special Agent Erfel Matanguihan with Homeland

10   Security Investigations, HSI.

11             THE COURT:  Okay.  Good afternoon, Agent

12   Matanguihan and Ms. San Nicolas, United States Attorney.

13             AGENT:  Good afternoon.

14             MR. MOOTS:  Good afternoon, Your Honor.  Jeffrey

15   A. Moots on behalf of Kenneth Calvo, who is seated to my

16   right.

17             THE COURT:  Okay.  Good afternoon, Mr. Moots,

18   Mr. Calvo.

19             THE DEFENDANT:  Good afternoon, Your Honor.

20             THE COURT:  Okay, you ready to proceed to

21   sentencing, Counsel?

22             MR. MOOTS:  Yes, Your Honor, we are.

23             THE COURT:  All right.  Let's see, so Mr. Kenneth

24   Calvo, you have pled guilty to information, attempted

25   possession of methamphetamine with intent to distribute, and

1    that is Count 1 of the information.

2             Mr. Moots, have you had a full opportunity to

3    review the defendant's file, his presentence report, and

4    discuss all of this with Mr. Calvo?

5             MR. MOOTS:  Yes, Your Honor, between myself and

6    Mr. Cunliffe, we went over this with him.

7             THE COURT:  All right, so Mr. Calvo, did you have

8    a full opportunity to discuss your sentencing today and

9    discuss your presentence report with both Mr. Randy Cunliffe

10    and Mr. Jeff Moots?

11             THE DEFENDANT:  Yes, I did, Your Honor.

12             THE COURT:  Okay, do you have any questions about

13    your presentence report?

14             THE DEFENDANT:  No, Your Honor.

15             THE COURT:  All right.  As I understand it, the

16    United States Attorney has no objection to the presentence

17    report?

18             MS. SAN NICOLAS:  That's correct, Your Honor.

19    The presentence report was adopted in June -- I'm sorry, Your

20    Honor, May -- June 5, 2014, Document 54.

21             THE COURT:  Okay, very well.  Let me just say, I

22    see there's some objections with Mr. Moots and Mr. Cunliffe's

23    position regarding the presentence report, specifically as to

24    Paragraph 57.  Oh, before we get off, let me just say,

25    Mr. Ventura is here and then also, is Maggie on the line?

     1          PROBATION OFFICER:  Yes, Your Honor, I'm on the

     2     line.

     3          THE COURT:  Okay, so Maggie Wonenberg is the

     4     United States Probation Officer who wrote the report.  She's

     5     in Saipan right now so I asked her to be here and Mr. Ventura

     6     is also assisting.  All right.  So there was an objection to

     7     Paragraph 57, Mr. Moots, wherein the probation had indicated

     8     that the defendant is an organizer, leader or manager of the

     9     offense, and before I came into Court today, the U.S.

    10     Probation Officer, Ms. Wonenberg, had indicated that she was

    11     going to withdraw that.

    12          MR. MOOTS:  All right, Your Honor, that would be

    13     fine.  We would not object to that.

    14          THE COURT:  All right.  You understand that, Ms.

    15     San Nicolas?  She's indicating that -- because she spoke to me

    16     today and I -- before we walked in, and we discussed whether

    17     or not there was evidence that Mr. Calvo was a leader, an

    18     organizer, and -- or manager of the offense.  And she felt

    19     that she didn't feel like she should go forward with that.

    20     What is your feeling on that, Ms. San Nicolas?

    21          MS. SAN NICOLAS:  May I just have a moment, Your

    22     Honor?

    23          THE COURT:  Sure.

    24          (Pause.)

    25          (Counsel conferred with agent.)

1          MS. SAN NICOLAS:  Your Honor, we do not object

2   and agree to take that paragraph out as -- Item 57.

3          THE COURT:  All right, very well.  So the -- so

4   Mr. Moots, I'm sure you're --

5          MR. MOOTS:  Yes.

6          THE COURT:  You and your client are in agreement

7   with that?

8          MR. MOOTS:  We are in agreement, Your Honor, yes.

9          THE COURT:  Okay, then the issue of whether or

10  not he deserves a minor role, okay, that's one issue that --

11  you still want to pursue that; correct, Mr. Moots?

12         MR. MOOTS:  Yes, Your Honor.  And --

13         THE COURT:  And then the issue of the criminal

14  history, before we get into the minor role.

15         MR. MOOTS:  Right.

16         THE COURT:  The criminal history, you're saying

17  that the defendant indicates he was not convicted of the crime

18  of possession of a controlled substance in Modesto?  Do you

19  disagree with that or agree we that?

20         MR. MOOTS:  Well, Your Honor, the probation

21  office provided us a printout from the Stanislaus County in

22  California that indicates that he entered a plea of nolo

23  contendere in September 10, 2012.  My client indicates he

24  doesn't recall that.  But he's not contesting it, if that's --

25  if that's what the Court records show, he just did not

```
 1   believe --
 2              THE COURT:  Uh-huh?
 3              MR. MOOTS:  -- that he had done that.  That's why
 4   we put that in there is, he thought that it was still in
 5   pretrial and that's -- that was sort of the confusion and it's
 6   still a little confusing.  But it looks like the case was
 7   closed on the 26th of -- that's weird.
 8              (Read report.)
 9              THE COURT:  Do you want to -- Mr. Ventura, you
10   want to show -- you want to explain that to Mr. Moots?
11              PROBATION OFFICER:  Oh, for the conviction, Your
12   Honor?
13              THE COURT:  Mm-hmm.
14              PROBATION OFFICER:  So the no contest plea, it
15   counts as a prior sentence.
16              MR. MOOTS:  No, I understand that.  I'm just
17   looking at the printout that has the case being closed -- or
18   it's automatic it looks like, because it's got Prop 36
19   hearing, pretrial hearing on the 26th, and then it's got
20   everything down to case closed in 2015, and then it -- which
21   hasn't occurred yet, that's next year.  So the case can't be
22   closed, but it says, Case Events, and it says, events occurred
23   in 2087 for purged file.  So it's just a strange -- it's just
24   a strange report I'm having, but I understand that they -- it
25   says probation and sentence on the 26th of September, so if
```

1  that's --

2          THE COURT:  We looked at the probation sentence,

3  right, we don't look at whether the case was actually -- well,

4  do we look at whether the case has been closed?

5          MR. MOOTS:  We don't, Your Honor.  I was just

6  trying to figure out how this report was generated since it's

7  got events well into the future as to how reliable it is, that

8  was just my question.  But it says, Status, so I'm assuming

9  that that means that's what's supposed to happen on that

10 particular date.

11         THE COURT:  Mm-hmm.

12         MR. MOOTS:  And then in 2087, they're supposed to

13 purge the file, so I understand now, I'm just sort startled by

14 dates of 2015 and 2087.

15         THE COURT:  Yeah, I don't know.  All I -- do you

16 know?

17         PROBATION OFFICER:  Your Honor, it's -- I can't

18 speak about that because that's their Court document.

19 However, I could speak -- just reiterate the fact that that's

20 an adjudication of guilt, which of course, warrants a prior

21 sentence under the guidelines.

22         THE COURT:  Right.  And so he -- so he was

23 adjudicated of guilt -- adjudicated of guilt because he pled

24 no contest?

25         PROBATION OFFICER:  That's correct.

```
 1                    THE COURT:  And he was sentenced to probation?

 2                    PROBATION OFFICER:  That's correct.

 3                    THE COURT:  All right.  And when was he sentenced

 4   to probation?

 5                    PROBATION OFFICER:  I believe that was

 6   September 26, 2012.

 7                    THE COURT:  Uh-huh.  Does it say how long his

 8   probation was?

 9                    OFFICER WONENBERG:  It says three years.

10                    THE COURT:  So it would be this year -- oh, next

11   year that it would be ending, right?

12                    OFFICER WONENBERG:  Correct.  Next year, 15 --

13   2015.

14                    MR. MOOTS:  This report doesn't show what the

15   sentence was.

16                    THE COURT:  Oh, I think it does.  Did you show

17   him the report you showed me, Mr. Ventura?  I thought you

18   showed --

19                    PROBATION OFFICER:  Yes.  I believe the sentence,

20   however, was probably gathered from another document, probably

21   the NCIC report, possibly.

22                    THE COURT:  Mm-hmm.

23                    PROBATION OFFICER:  Or this report.

24                    OFFICER WONENBERG:  I do have those, yes.

25                    THE COURT:  Mm-hmm.  All right.  So Mr. Moots,
```

1    based on the document that was presented by probation...

2                    MR. MOOTS:  Yes, Your Honor, my client says that

3    he didn't recall it but he's not objecting to it if that's

4    what the Court records show.

5                    THE COURT:  Okay.  Well, I will then take the

6    Court record as true.  If the U.S. Probation Officers are

7    indicating that they believe it's verified that the defendant

8    does have this prior conviction.

9                    PROBATION OFFICER:  Yes, Your Honor.  In addition

10   to that, on Paragraph 7 on Page 17 of the final presentence

11   investigation report, the probation office has erred in not

12   entering or adding an additional 1 point under 4A1.1(c).

13                   THE COURT:  Mm-hmm.

14                   PROBATION OFFICER:  Which still leaves the

15   defendant at the same category of Criminal History

16   Category III.

17                   THE COURT:  Mm-hmm.  So you've just given him an

18   extra -- I mean, an extra break, is that what you're saying?

19                   PROBATION OFFICER:  Extra point, Your Honor.

20                   THE COURT:  You're taking out an extra point or

21   you're going to -- you wanna add --

22                   PROBATION OFFICER:  Add an extra point.

23                   THE COURT:  You wanna add in an extra point?

24                   PROBATION OFFICER:  That's correct.

25                   THE COURT:  But it still keeps the Criminal

1    History Category the same?

2                    PROBATION OFFICER:  That's correct.

3                    THE COURT:  And that's because you guys forgot to

4    put in the 4A1.1, is that what you're saying?

5                    PROBATION OFFICER:  C.

6                    OFFICER WONENBERG:  That's right, Your Honor.

7    And that would be my original mistake when I calculated the

8    Criminal History, I -- I tagged him for committing the -- this

9    instant offense, while under a sentence of a criminal justice

10   sentence, which is noted on that -- on the presentence report

11   as 4A1.1(d), that's under Paragraph 70.  But what I didn't put

12   in was the conviction itself, merits a 1 point, under 4A1.1(d)

13   -- I mean, small letter C, as in Charlie.

14                    THE COURT:  Okay.  Do you understand that,

15   Mr. Moots?

16                    MR. MOOTS:  I'm trying to look at what they're

17   saying here.

18                    THE COURT:  Okay, so look at -- you have the

19   presentence report?

20                    MR. MOOTS:  I do, Your Honor.

21                    THE COURT:  Okay, so look at Paragraph 70.

22                    MR. MOOTS:  Yes.

23                    THE COURT:  Page 17.

24                    MR. MOOTS:  They've got it for 2 points.

25                    THE COURT:  They got it for 2 points and what Ms.

Wonenberg is saying is she forgot to put in the 1 point under

4A1.1(c), where it says you have to add 1 point for each prior

sentence.  He got the 2 points because --

        MR. MOOTS:  Right.

        THE COURT:  -- as she indicated, he committed the

offense while under any criminal justice sentence.  Let's

see...

        MR. MOOTS:  Right, I see what she's saying.  So

that should be 3 points which still leaves you in

Category III.

        THE COURT:  Right, so there's no -- I mean, it

doesn't change his Criminal History Category, okay?  So no

objections then, Mr. Moots?

        MR. MOOTS:  No, Your Honor.

        THE COURT:  Okay, very well.  So the defendant --

all right.  So we've taken care of two of the objections, one

has been withdrawn, the other one has been clarified.  Now the

issue is, does this defendant, should he receive a -- a minor

role?

        MR. MOOTS:  Yes, Mr. Cunliffe filed for a minor

role...

        THE COURT:  Mm-hmm.  Okay.  Okay, yes, Mr. Moots,

do you want to talk to me about this?

        MR. MOOTS:  Yes, Your Honor.  The reason that --

        THE COURT:  Could you approach the podium, sir?

1          MR. MOOTS:  Yes, Your Honor, no problem.

2          THE COURT:  Thank you.  You have to -- okay, you

3    have the burden to demonstrate by preponderance of the

4    evidence that --

5          MR. MOOTS:  Yes, Your Honor.

6          THE COURT:  -- the defendant would be entitled to

7    the mitigating role reduction.

8          MR. MOOTS:  Yes, Your Honor.  The reason that

9    Mr. Cunliffe filed that is the evidence in this is that

10   Mr. Calvo, as it indicates, had a very minor role.  When Mr.

11   Streeter was debriefed in November, he indicated that there

12   was a large distribution network, and he goes through all of

13   the contacts; that he started his operation in 2011; he goes

14   through all of the details of Mr. Streeter's operation, which

15   I'm sure the Court sure is familiar with since you've got

16   Mr. Streeter's record.  But then, in his debrief, he states

17   that he'd known Mr. Calvo for a little over a month, that he

18   didn't indicate that Mr. Calvo had any portion of -- any

19   operational control or any operational aspect whatsoever of

20   Mr. Streeter's criminal operation.  He agreed to pick up this

21   package for him when a Ron Calvo was not able to.  And he

22   picked it up, took it to Mr. Streeter, and they got arrested.

23   There's no indication that my client had any -- any role in

24   Mr. Streeter's importation of controlled substance over the

25   last 3 or 4 years, other than that single time of picking up a

package from a post office box that had originally been intended to be picked up by Ronald Calvo, who was able to pick it up because he had been arrested for family violence. So my client's total involvement in Mr. Streeter's drug operation of importation of methamphetamine from the mainland to Guam and distributing it, was picking up the box that one time, and taking it to a location where he was supposed to exchange it with Mr. Streeter. That's his role in this whole operation.

THE COURT: Okay. Thank you.

MR. MOOTS: So that's about as minor a role as he could get and still be involved.

THE COURT: Okay, let me hear from the U.S. Attorney's Office. Ms. San Nicolas, do you agree with Mr. Moots?

MS. SAN NICOLAS: No, Your Honor, we do not.

THE COURT: Okay. So you think that the defendant is not entitled to a minor role?

MS. SAN NICOLAS: That's correct, Your Honor.

THE COURT: Okay.

MS. SAN NICOLAS: Your Honor, this defendant, Defendant Calvo --

THE COURT: Uh-huh.

MS. SAN NICOLAS: The facts that pertain to this -- this series of events have been detailed in the presentence report, which is, as I understand, have been adopted by the

defense with the exception of Paragraph 59.  Your Honor, we

would just like to point out that, as detailed in the

presentence report, which does an excellent job of detailing

the facts, there were predelivery or prepackage delivery

events where the defendant, Kenneth Calvo, introduced Pops --

that's the nickname for Clyde Streeter -- to another person

named Lizama.  Your Honor, we point that out because we

believe that this, as well as other facts that I will detail

in a second, indicate the defendant is ineligible for a minor

participant role.  Your Honor, he -- the defendant introduced

Clyde Streeter to Lizama, the defendant, Kenneth Calvo, stated

that Pops would give Lizama 2 ounces to sell -- 2 ounces of

methamphetamine to sell for 16,000, and this is with regards

to the methamphetamine that was contained in the starter.  So

we're talking about 214 grams of methamphetamine.

We know that the defendant has taken it upon

himself to receive a package that was intended for Ron Calvo,

and we know that the defendant himself claimed -- decided to

claim the package for Pops, Clyde Streeter.  We know from

Aguon that the defendant has engaged in a prior sale of

methamphetamine at the NCS area in the White Market.

We know, Your Honor, that the day that the

package was picked up by the defendant, Ken Calvo, he

coordinated the pickup.  He arranged to get rides to two post

offices, and that was starting at the Lizama residence in

1    Mangilao; he arranged to get a ride with Paul Aguon; and he,

2    along with Shawn Lizama, drove to the Barrigada Post Office

3    and was followed by Clyde Streeter.  The package wasn't there

4    yet; they continued to drive to Besta Mart, where the

5    defendant, Kenneth Calvo, picked up, apparently, some type of

6    card for his cell phone use to enable him to speak with

7    Streeter.  We know that they continued all the way to Yigo,

8    and the package was not there.

9         So -- we know that he also -- they also stopped,

10   I think, at a Winchell's area and the Yigo Post Office.  Now,

11   this is all before the actual pickup.  Later in the afternoon,

12   the actual pickup occurred.  We know that the defendant,

13   Kenneth Calvo, left his phone number at the post office; his

14   phone number of 689-4938, telling them, Call me when the

15   package arrives.

16        We know that he drove a white Mitsubishi Montero

17   to the Yigo Post Office; he entered; presented his passport to

18   pick up the package.  And then he drove with the package,

19   which contained the methamphetamine, back to Mangilao where he

20   entered Apartment 113 and opened the package, apparently, in

21   his vehicle -- in the white Montero, and that was the point

22   when the package alerted.  He left the empty packaging on the

23   seat of the vehicle; he entered the residence, and he and

24   Clyde Streeter attempted to dismantle the starter -- it was an

25   engine starter that was hollow and filled with

1   methamphetamine.

2          Your Honor, we believe the defendant is

3   ineligible for a minor participant role.  The defendant's

4   conduct can't be -- or should not be described as minimal,

5   because this defendant actively tried to make the receipt of

6   the drugs occur, he recruited others, at least two other

7   people --

8          THE COURT:  Sorry, but he's not asking for a

9   minimal participant, he's asking for minor participant role,

10   which is decreased by 2 levels.

11          MS. SAN NICOLAS:  Right.  He's asking for a minor

12   participant under -- for 2 levels, you're right, Your Honor.

13          THE COURT:  Right.  Okay.

14          MS. SAN NICOLAS:  He obtained rides to the post

15   office with Paul Aguon --

16          THE COURT:  What is the -- let's look at the

17   definition of minor participant.  Is he less culpable -- I

18   guess the question is, has the defense proven that --

19          MS. SAN NICOLAS:  He's less culpable --

20          THE COURT:  Go head.

21          MS. SAN NICOLAS:  -- than most other

22   participants, but whose role could not be described as

23   minimal.  And that's the standard in the sentencing

24   guidelines.  He's just very minimally less culpable than the

25   co-defendant, Clyde Streeter.  He's not less culpable.  He was

1   as active as Streeter in obtaining this package because he got

2   the ride, he took those many steps, not just one step, to go

3   search for the package and then actually picking up the

4   package.

5   THE COURT:  Okay, let's look at who are all the

6   participants and then let's look at their role.  That's what

7   you have to do, you have to -- okay, how many people are

8   involved?  And then, where does Kenneth Calvo fit amongst all

9   of these participants?

10  MS. SAN NICOLAS:  He's directly under Clyde

11  Streeter.

12  THE COURT:  So Clyde Streeter has got a higher

13  role in this drug operation?

14  MS. SAN NICOLAS:  Yes.

15  THE COURT:  That's what you're saying?

16  MS. SAN NICOLAS:  Yes, Your Honor.  He was the

17  person who obtained the package from the mainland, from a

18  person that he did identify in the presentence report.  So he

19  arranged to have the package brought to Guam containing that

20  amount of methamphetamine.

21  THE COURT:  Mm-hmm.

22  MS. SAN NICOLAS:  But then once the package was

23  here, then the defendant here started taking a very active

24  role in obtaining it, organizing people -- or rather, managing

25  people and moving people around, getting rides, and trying to

1  make this happen.  He also took an active role in figuring out

2  what's gonna happen to the product within that -- within that

3  box, within that starter.  And he informed the people that he

4  gave a ride with that one would receive a sample of the drug

5  in exchange for the ride, and another could push the drug,

6  could settle drug for $16,000, 2 ounces.

7           Your Honor, those facts, we believe, show that

8  the defendant is ineligible for a minor participant.  He's

9  shown a keen interest in the package.  When he was arrested,

10 he possessed the tracking number.  And Your Honor, he was

11 caught red-handed with the Clue Spray on his fingers.  Because

12 he planned for the distribution of the package, amongst those

13 other people --

14           THE COURT:  Okay, so Clyde Streeter, you think is

15 the top guy?  And then you think Ken Calvo is the next guy?

16           MS. SAN NICOLAS:  Slightly below him, yes.

17           THE COURT:  Slightly below.  And his

18 participation was he got rides from others, he had the Clue

19 Spray, what else did you say?  He --

20           MS. SAN NICOLAS:  He planned the distribution of

21 the drugs.

22           THE COURT:  Okay, and when you say that, who did

23 he plan the distribution with?

24           MS. SAN NICOLAS:  He informed Lizama that Lizama

25 was going to receive 2 ounces of the drug --

1          THE COURT:  Okay.

2          MS. SAN NICOLAS:  -- for $16,000 to sell.

3          THE COURT:  Oh, this is the part where he wanted

4    to make $4,000 profit?

5          MS. SAN NICOLAS:  Correct, Your Honor.

6          THE COURT:  Okay.

7          MS. SAN NICOLAS:  And that the driver of the

8    vehicle would receive a smaller amount of methamphetamine for

9    giving them a ride on October 15, 2003.

10          THE COURT:  Was that Aguon?  The driver was

11    Aguon?

12          MS. SAN NICOLAS:  Paul Aguon.

13          THE COURT:  Okay.  And Aguon was to receive what,

14    money?

15          MS. SAN NICOLAS:  He was supposed to receive a

16    portion of the methamphetamine.

17          THE COURT:  Some drugs, okay.

18          MS. SAN NICOLAS:  Some amount.

19          THE COURT:  Okay, what other participation did he

20    have?

21          MS. SAN NICOLAS:  Your Honor, essentially that

22    sums it up.  He made the receipt of the drugs occur; he

23    recruited others; and he planned who would distribute the

24    drugs after the drugs were received.

25          Your Honor, we believe that the defendant is

1  slightly less culpable than Clyde Streeter.  But, Your Honor,

2  his role is greater than that of the other participants and we

3  don't believe that his role can be described as minimal for

4  the purposes of a minor participant.

5  THE COURT:  Mm-hmm.  Okay, hold on.  Okay.  Okay,

6  Mr. Moots, do you want to reply to Ms. San Nicolas's argument

7  that --

8  MR. MOOTS:  Yes.

9  THE COURT:  -- your client has a pretty strong

10 role as a participant, close to Clyde Streeter?

11 MR. MOOTS:  Yeah, actually, Your Honor, I do.  I

12 mean, to say that my client is slightly less culpable of the

13 offense involved is a great overstatement.  I mean, Mr.

14 Streeter was involved in long-term importation of

15 methamphetamine into Guam over a number of years to which he's

16 admitted to, gave a full debrief to the government in his

17 November statement.  He detailed purchasing it in the

18 mainland, bringing it back, moving money around, doing all of

19 that, whereas my client agreed to pick up one package for him.

20 And regarding the allegation that my client told

21 Lizama he could get 2 ounces, I refer to the Court to the plea

22 agreement that Mr. Streeter signed in this case, 13-0063 [sic]

23 on Page 4, where Mr. Streeter's statement says that on

24 October 16, 2003, he told -- Streeter told the individual,

25 after the package was picked up, Streeter would tell -- sell

1  the individual 2 ounces for $16,000.  So the communication was

2  between Mr. Streeter and the individual who drove the car.

3          Mr. Calvo didn't have any authority over the

4  distribution of that, that drug.  Mr. Streeter's already

5  admitted that he was the one who made the arrangement so that

6  they could -- the person would be reimbursed for the ride if

7  that's what he wanted.  The other activity was -- the other

8  thing is, all of these rides and all of these trips,

9  throughout the whole thing, Mr. Streeter followed along and

10  they stopped periodically.  That's in the plea agreement.  And

11  particularly in -- Mr. Streeter's, actually in 4, says he

12  follows him along, he tells Calvo to get minutes so that they

13  can talk on the phone.

14          So I don't really know how you can say that my

15  client is just slightly more -- less culpable than Mr.

16  Streeter.  Mr. Streeter was running a big drug operation.

17  He'd known my client about a month.  My client agreed to pick

18  up a package for him.  Yes, he went to a friend's house, he

19  got a ride to several post office, each time he went,

20  Mr. Streeter followed him.  He went in to the first one, they

21  didn't have the package, they directed him elsewhere.  He went

22  there, Streeter followed him, he got instructions from

23  Streeter, and he moved on to get what he was supposed to get.

24  So I don't think that it's a logical assumption to say that

25  he's just minorly less culpable than Mr. Streeter.

                    THE COURT:  What about Ms. San Nicolas' argument
that your client planned distribution with Lizama to -- with
Lizama and then he made a plan with driver Aguon to receive
methamphetamine?

                    MR. MOOTS:  Well, that's not consistent with what
Mr. Streeter says in his plea agreement.  He says he's the one
who made the arrangements with Mr. Lizama.  Because that's the
person that she says was making the arrangements for the 2
ounces.  And Mr. Streeter's the one who made that.  It was
Mr. Streeter's drugs.  Mr. Streeter admitted that he made all
of those arrangements.  He never says in -- anywhere, that he
gave Kenneth Calvo the authority to plan any of the
distribution of his drugs.

                    You know, even the agreements that people got
drugs through -- supposedly we're gonna get drugs out of this,
was from Mr. Streeter.  Mr. Streeter said, yeah, this is what
you're gonna get.  You know, my client, I believe, owed one of
the individuals money, I think that's in his plea agreement.
I think it's -- let me double check who he owed the money to,
I think it's -- he owed him $500 -- it was Mr. Lizama, and he
would pay him the $500.  And that's when he met Mr. Streeter,
who then agreed to let Lizama have drugs in exchange for --
Mr.... (reading) Mr. Lizama says it was Calvo that told him
that, but it's not Mr. Calvo, according to Mr. Streeter's plea
agreement.  It's Mr. Streeter.

1              THE COURT:  Okay.

2              MR. MOOTS:  All of the arrangements were made

3    with the person who owned the drugs.

4              THE COURT:  Okay, so you're thinking this is one

5    isolated incident with your client?

6              MR. MOOTS:  Well, according to Mr. Streeter's

7    interview with the government, he'd only known my client for a

8    month, and that my client may or may not have been involved in

9    drugs on his own, but he was not a component of Mr. Streeter's

10   operation, because even the government has to admit that the

11   original intended recipient of this was a Ron Calvo, who, the

12   only reason he didn't pick it up was he got arrested for a

13   domestic violence.  And then --

14             THE COURT:  They were cousins, right?

15             MR. MOOTS:  Yeah, they're distant cousins, I

16   don't think they're closely related.  And then my client

17   became involved in picking up the package.  It was the first

18   time he'd ever done anything like that with Mr. Streeter, so

19   he's not a major component of Mr. Streeter's operation.  He's

20   far below Mr. Streeter.  And I think that's why Mr. Cunliffe

21   moved for the -- the minor participation.

22             THE COURT:  Okay.  All right.

23             MR. MOOTS:  Thank you.

24             THE COURT:  Okay, thank you.  Ms. San Nicolas,

25   you want to respond to --

          1          MS. SAN NICOLAS:  Just very brief, Your Honor.

          2          THE COURT:  Yeah, what about all this argument he

          3   makes about Streeter?

          4          MS. SAN NICOLAS:  Your Honor, it's not --

          5          THE COURT:  Mm-hmm?

          6          MS. SAN NICOLAS:  It's very possible that

          7   Streeter had an -- Streeter, who was obtaining the drugs, was

          8   bringing the drugs in, had the supply, had an agreement with

          9   both, he told Lizama, move the drugs or -- and Calvo was with

         10   Lizama when they were driving around to pick up the drugs.  I

         11   just want to clarify that -- that the defense suggested or

         12   stated that the agreement was between Streeter and the driver

         13   of the car, that the driver of the car was Paul Aguon.  Paul

         14   Aguon had a pickup truck, it had extra cab, that's why he was

         15   able to fit the defendant, as well as Lizama, in the back seat

         16   in his truck.  So they were all going to pick up this product,

         17   everybody knew what they were gonna do.  And everyone knew

         18   what their role was.  The defendant was gonna go into the post

         19   office, try and pick up the drugs at the Barrigada Post

         20   Office, and then the Yigo Post Office.  They were being

         21   followed by Streeter, who apparently was monitoring this

         22   thing.

         23          The point is that everyone knew that Lizama was

         24   going to get a portion of the drugs and Lizama was going to

         25   push that.  It's very possible that Streeter -- Streeter's

statement, I had an agreement with Lizama to move the drugs,
was something that he conveyed to the defendant, Calvo.

Now, Defendant Calvo was acting, in our position,
as a manager. He was trying to make this all happen, make all
these agreements happen. And his actions indicate that he was
trying to make sure that this occurred, that the people who
were gonna receive a small portion or a portion of the drugs,
actually receive that. He was unsuccessful the first time and
because the package was not there, and he ended up going on
his own -- and he was observed by HSI when he picked this up
-- when he picked up the package, and he went there alone and
picked up the package on his own.

THE COURT: Well, I don't think you -- you don't
really mean to say he was the manager because you've already
agreed to withdraw the -- the --

MS. SAN NICOLAS: The minor --

THE COURT: No, the leader, manager --

MS. SAN NICOLAS: Of the offense?

THE COURT: -- organizer of the offense.

MS. SAN NICOLAS: Let be rephrase that then, Your
Honor.

THE COURT: Right?

MS. SAN NICOLAS: The government does not believe
that he merits a minor role, because he actively made sure
that people were there who could receive the drugs, who could

1    carry on the distribution of the drugs were there, because he

2    arranged for the ride.  He arranged to have all the parties

3    there so that in the event they were able to get the

4    methamphetamine, they were gonna successful go out and

5    distribute it.  And so, Your Honor, we believe that the facts

6    as is, the facts detailed in the presentence report, that he

7    should be ineligible for a minor participant role.

8              THE COURT:  But you're saying that his role --

9    just to be clear, you're saying that his culpability is

10   greater than Lizama and Aguon?

11             MS. SAN NICOLAS:  Correct.

12             THE COURT:  Right?

13             MS. SAN NICOLAS:  But less than Clyde Streeter's.

14   We give the defense that.  We recognize that Streeter probably

15   had a more long-term attempt to distribute methamphetamine.

16   And certainly, we recognize that.  But as far as the

17   214.9 grams of methamphetamine, the defendant did not, in the

18   government's opinion, have a minor role.

19             THE COURT:  Yeah.  Okay.  Yeah, because --

20   anybody else though?  Okay, so his culpability is less -- less

21   than -- I'm sorry, is greater than Aguon and Lizama, but less

22   than Mr. Streeter?

23             MS. SAN NICOLAS:  Correct.

24             THE COURT:  Is there any other co-defendant or

25   co-conspirator involved in this besides Streeter, Mr. Ken

1    Calvo, Aguon and Lizama?

2              MS. SAN NICOLAS:  I suppose the distributor --

3    the supplier in the mainland.

4              THE COURT:  Uh-huh.

5              MS. SAN NICOLAS:  Because we do know that his --

6    the family was sending methamphetamine to Clyde Streeter.

7              THE COURT:  Okay.

8              MS. SAN NICOLAS:  The other persons that were

9    involved, I believe, that covers it for now.  We know that

10   Lizama was in the vehicle at the time.  We know that at the

11   time that there was -- the defendants were arrested, that

12   Shawn Lizama and Christine Lizama were outside of the

13   residence.

14             THE COURT:  Okay, so just -- let's see, let me

15   just -- I'm looking at the Ninth Circuit case law on this.

16   Because it says that under 3B1.2, this minimal or minor

17   participant adjustment is available only if the defendant was

18   substantially less culpable than his co-conspirators -- or

19   co-participants, right?

20             MS. SAN NICOLAS:  That's correct, Your Honor.

21             THE COURT:  So was the defendant -- was his role

22   substantially less culpable than his co-participants, you're

23   saying no?

24             MS. SAN NICOLAS:  We believe that he is slightly

25   less culpable than --

```
 1                  THE COURT:  Streeter.

 2                  MS. SAN NICOLAS:  -- Clyde Streeter.  Because

 3     again, we're focusing not on the delivery of, you know,

 4     packages that occurred prior to, we're focusing on the

 5     214.9 grams, as far as that package was concerned, we believe

 6     he is less culpable -- slightly less culpable than Clyde

 7     Streeter and more culpable than anyone else who was in the

 8     vehicle.

 9                  THE COURT:  Okay, but is the case law though that

10     you have to show that the defendant was substantially less

11     culpable than his co-participants -- substantially less

12     culpable.  So the only two -- the only two higher persons than

13     Calvo would be the person that the drugs came from in the

14     states?

15                  MS. SAN NICOLAS:  In the mainland.

16                  THE COURT:  And then Streeter?

17                  MS. SAN NICOLAS:  Correct.

18                  THE COURT:  Right?

19                  MS. SAN NICOLAS:  Correct.

20                  THE COURT:  So how do we show that his role

21     substantially less culpable than those co-participants?  Or

22     how is -- is there any evidence --

23                  MS. SAN NICOLAS:  I think the defense hasn't

24     shown that he's substantially less culpable.  He is slightly

25     less culpable, but not substantially so, because he took such
```

1    an active role.

2                    THE COURT:  Okay.  And it's the defense's burden

3    anyway?

4                    MS. SAN NICOLAS:  Correct.

5                    THE COURT:  So you're saying that he needs to

6    show the Court that he's substantially less culpable.  What

7    about his comments though regarding his plea agreement --

8    Streeter's plea agreement, and his factual basis within the

9    plea agreement about having a more substantial role in the

10   drug distribution?

11                   MS. SAN NICOLAS:  Your Honor, this is -- this was

12   a common -- this was an agreement that -- it was very clear to

13   all the persons in the vehicle that Streeter's going to have

14   the drugs sent, that defendant Calvo -- Kenneth Calvo, was

15   gonna pick up the drugs instead of Ron Calvo, and we know that

16   we have two people who were going -- or at least one person

17   who was going to move or be a distributor of that product.

18                   THE COURT:  Okay.

19                   MS. SAN NICOLAS:  So Your Honor, we --

20                   THE COURT:  Okay.

21                   MS. SAN NICOLAS:  We don't believe that the

22   defense has shown that he is substantially less culpable than

23   the co-defendants in this case.

24                   THE COURT:  Okay.  All right.  Thank you.  So

25   Mr. Moots, you want to just -- okay, I think you've already --

Case 1:13-cr-00063   Document 113   Filed 03/28/19   Page 30 of 68

1   your argument really is the Streeter argument about his plea

2   agreement, right?

3                MR. MOOTS:  Well, yes, Your Honor.  And I mean,

4   based on substantially less culpable, I mean, if you're

5   looking at the entire chain, there is, in the chain with Mr.

6   Streeter, there's the organization that produced and provided

7   the drugs to the family members of Mr. Streeter.

8                THE COURT:  Mm-hmm.

9                MR. MOOTS:  Mr. Streeter's family, who then made

10  arrangements to distribute that to Mr. Streeter and others via

11  the U.S. mail.  There's Mr. Streeter, who made the

12  arrangements for the importation or the distribution of it

13  across state lines and dealt with the return of money in that

14  organization.  Those are the levels of people that the

15  government says is above my client.

16               So you've got manufacturers, this is people that

17  distribute it for the manufacturers; Mr. Streeter's family who

18  picks it up for him in the states and does whatever they do

19  with it.  Then they send it to Mr. Streeter, who then has a

20  distribution organization and sends money back to the

21  mainland.  Then you have my client, who agreed to pick up a

22  box with drugs in it, that he knew there were drugs, he's

23  admitted to that.  And he got a ride from his friends to go to

24  a post office, and then drove to a post office to pick up the

25  box and took back to Mr. Streeter in apartment.  When he's

arrested, he's outside.  He's unwrapped the package, left the

stuff in his car, but he's arrested coming out, answering a

phone, and Mr. Streeter's inside with the automobile part,

attempting to find tools to take it apart to get the drugs,

that's when he gets arrested.  So if you look at whether or

not my client is substantially less culpable of just this

214 grams, as Ms. San Nicolas says, the answer is, to the

people above him, yes, substantially.  I mean, he wasn't

involved in the manufacturing; he wasn't involved in the

distribution of the bulk material to Mr. Streeter's family; he

wasn't involved in making the arrangements to ship it to

Mr. Streeter.  Mr. Streeter is the one who made all the

arrangements for the distribution, and then when Ron Calvo

gets arrested for family violence, he gets my -- my client

agrees to pick up a package and gets a friend to give him a

ride, takes it -- goes to another post office by himself in

the Montero or whatever it was, and then drives back and meets

Mr. Streeter.

        Now, I don't know how you can say that that

involvement is not substantially less than his

co-conspirators, Mr. Streeter and the people above him.  It

may be greater than Mr. Lizama and Mr. Aguon, but they're at

the very bottom of the chain.  It doesn't get any lower than

just driving around.  But if you're comparing him to the

people that they've acknowledged had a much greater

1    involvement than him, his participation is substantially less
2    than theirs.  You know, I just don't see any way to say that
3    it's not.  You know, Ms. San Nicolas and I can disagree about
4    this all day but I think, in a logical fashion, if you look at
5    the progression down to where my client makes the agreement to
6    go pick up a box, even for that 214 grams, there's a lot of
7    activity that has to go on long before it arrives at a post
8    office on Guam that my client goes and picks it up at, and he
9    didn't have any involvement in that.  Until Ron Calvo gets
10   arrested, he doesn't even know the package is coming.
11           So he didn't -- he didn't even -- wasn't involved
12   in the planning of bringing it to Guam.  It's Streeter needs
13   somebody to pick it up, he goes and picks it up.  So I think
14   that's why it's substantially less than the people who are
15   above him in the food chain of the distribution network, even
16   for just that one package.
17           So I mean, I think we've probably given the Court
18   all the information that we can, but if you have any questions
19   I'll be glad to answer them.  That's, I think --
20           THE COURT:  Yeah, I'm just looking at the case
21   law here.  The Court has to look at the totality of the
22   circumstances.  And when I'm considering his involvement,
23   Mr. Calvo's involvement, I must consider his relative role to
24   all of the participants, and so we're looking at all the
25   participants as we've been --

1          MR. MOOTS:  Yes, Your Honor.

2          THE COURT:  All specified, who are all the

3     participants.  And the question is, is he -- was his role

4     substantially less culpable than his co-participants?

5          MR. MOOTS:  I think one of the ways you can look

6     that this, Your Honor, is to determine whether or not somebody

7     is substantially less culpable, is would the crime have

8     occurred without Mr. Calvo's participation?  If you take Mr.

9     Calvo, Mr. Aguon, and Mr. Lizama, the crime was gonna occur

10    with or without them, okay?  They're not really relevant to

11    the bringing of drugs on to the Island of Guam.  If Mr. Ron

12    Calvo had not been arrested for family violence in a -- you

13    know, on a Superior Court case, those three people wouldn't

14    have been involved at all.  But you still would have had

15    214 grams of methamphetamine manufactured in the United

16    States, probably in a larger quantity than that --

17         THE COURT:  Right.

18         MR. MOOTS:  -- given to -- a larger quantity than

19    that -- probably given to the people in the United States --

20    in the mainland, and I think it's Nevada, who packaged it up,

21    and then sent it to Mr. Streeter.  And then it could be any

22    random individual who picks it up at the post office box.  And

23    in this case, it was -- the plan was somebody other than my

24    client.  When that fell apart, he then is inserted into the

25    machinery to pick up the package.  So if you look at it like

that part, is he an essential part of that operation, the
answer is no.  He's substantially less culpable because he's
not required.  If there is a break in the chain between the
manufacturer and Clyde Streeter, if you take any of those
three individuals out, that package never arrives on Guam.  If
you take Ken Calvo out, it could have been Ron Calvo, it could
have been anyone else that Mr. Streeter asked to go get a box
at a post office box.  He's not an essential element of that
operation.  He's not involved in making the plans to bring it
here, he's not involved in the plans of making sure the money
gets back to the states, he's not involved in any of the
planning.  He's basically the equivalent of a UPS driver, who
just goes and gets a package and drops it off to the person
he's delivering.  And it can be anybody.  And I think that's
what makes him substantially less culpable than the other
co-actors in the conspiracy related to the 214 grams.

THE COURT:  Okay.  All right.  Thank you.  Okay.
Yes, Ms. San Nicolas?

MS. SAN NICOLAS:  And Your Honor, just using the
standard, looking at the totality of the circumstances, we
just ask the Court to consider these additional facts that
were omitted by the defense.  That the defense omitted to
mention and that the defendant introduced Streeter to Lizama.
That happened before the package was there.  So that indicates
that he had -- he had more of a role in this -- slightly less

1    than Clyde Streeter, but he still had a role.  And Your Honor,

2    the other fact that I ask the Court to also consider in this

3    analysis is that the defendant inserted himself in there.  He

4    wanted that package very much.  Very much so, that he got a

5    package that was intended for a Ron Calvo.  The package could

6    have gone to Ron Calvo, sure.

7          But the point is, that this defendant took the

8    affirmative steps to make sure that he picked up the package,

9    and he went to two post office, and he went with other people,

10    and he inserted himself into this.

11          So Your Honor, to say, Well, you know, there is

12    somebody who makes the drug and so definitely the defendant is

13    -- is -- is at a great distance away from them, we just ask

14    the Court to note that the defendant is very close to Clyde

15    Streeter.  They both had the same interests, they wanted the

16    drug, they wanted to get the drug, and they wanted to

17    distribute it, and this defendant was very close with Clyde

18    Streeter as far as interest.  He inserted himself into this,

19    he wanted to make sure that this event occurred.  We believe

20    that he's ineligible for a minor participant.

21          THE COURT:  Okay.  The Court is -- thank you,

22    Counsels, thank you for the arguments.  The Court has

23    considered the arguments made by everyone and so under 3B1.2,

24    it applies to a defendant who plays a part in committing the

25    offense that makes him substantially less culpable than the

average participant.  So the Court has to look at the totality

of the circumstances and look at the facts of the particular

case.  And the burden is on the defense to demonstrate it by a

preponderance of the evidence that Mr. Calvo was a minor

participant, which is what the request is, is that the Court

consider him as a minor participant, relative to all the

participants in the criminal scheme for which he is charged.

And it appears from -- well, the case law says that the Court

has to look at whether or not the defendant was substantially

less culpable than his co-participants.  And the Court finds

that, based on the evidence that's been presented, that -- the

-- with regard to the definition, minor participant is

somebody who is less culpable than most other participants,

but whose role could not be described as minimal.  So of

course, the role cannot be described as minimal because

minimal means the defendant lacked knowledge or understanding

of the scope and structure of the enterprise and of the

activities of others.  And it's clear that the defendant did

have knowledge and understanding the scope and structure of

what was gonna go on with this package that came in through

the post offices here on Guam.  And the Court looked at the

structure of the enterprise who was involved, Aguon, Lizama,

Calvo, Streeter, maybe even Ron Calvo, and then the other

people who had brought -- who had sent the drugs into Guam by

the post services.  So the Court finds that the burden to

1    demonstrate by preponderance of the evidence, that he should

2    be entitled to the mitigating role reduction, has not been met

3    and the Court will deny the request for a minor participant

4    role, okay?

5                    MR. MOOTS:  Yes, Your Honor.

6                    THE COURT:  All right, very well.  Okay.  So we

7    are now -- okay, so I think those are all the objections, is

8    that correct, Mr. Moots?

9                    MR. MOOTS:  Yes, it is, Your Honor.

10                   THE COURT:  Okay.  So the presentence

11   investigation report then will -- I think that the only thing

12   that will be taken out, Ms. Wonenberg, will be the leadership

13   role, right?

14                   OFFICER WONENBERG:  That's correct, Your Honor.

15                   THE COURT:  There's nothing else that would be

16   removed; correct?

17                   OFFICER WONENBERG:  There is an adjustment

18   regarding the motion for a variance by the government.

19                   THE COURT:  Oh, okay.  Yeah, the minus 2 -- the

20   all drugs minus 2?  Yeah, let's talk about that.  We can get

21   that.  Ms. San Nicolas?

22                   MS. SAN NICOLAS:  Yes, Your Honor.  The

23   government moves and requests the Court to reduce the

24   defendant's calculation by 2 levels.  This is to reflect the

25   proposal by the sentencing commission to impose, across the

1   board, 2-level reduction for all drug offenses.  The defendant

2   certainly qualifies for this and I believe, Your Honor, that

3   the government did file a document indicating that.

4   Additionally, Your Honor, he did -- the defendant did, in a

5   timely manner, enter into a plea of guilty.  We request that

6   the additional 1 point be granted to the defendant.  That

7   there be an additional reduction.

8             THE COURT:  Okay, wait.  So for the all drugs

9   minus 2, that's where the United States Sentencing Commission

10  is asking that the Court go ahead and -- and the Justice

11  Department's agreeing that the Court go ahead and give the

12  defendant a minus 2 credit; correct?

13            MS. SAN NICOLAS:  That's correct, Your Honor.

14            THE COURT:  And of course, you have no objection,

15  Mr. --

16            MR. MOOTS:  We have no objection.  In fact, that

17  was one of the requests in our pleadings.

18            THE COURT:  Very well.  That's true.  And so the

19  Court will grant that request, seeing that United States

20  Congress will -- I don't think they've passed that yet, have

21  they?

22            MS. SAN NICOLAS:  It comes into effect in

23  November, but the Department of Justice agrees that it should

24  apply now, provided the defendant --

25            THE COURT:  Yeah --

           MR. MOOTS:  Congress has not taken any action so
it goes into effect, they didn't disapprove it.

           THE COURT:  Oh, okay.  All right.  So it will --
because they have not taken any action, it's gonna be
effective in November, is that what you're saying?

           MR. MOOTS:  That's correct, Your Honor.  So under
the Administrative Procedures Act, they have 60 days to act on
it if they don't approve it.  So it's an administrative
ruling.

           THE COURT:  Okay, very well.  So the Court will
grant that request and Mr. Calvo will get the minus 2 -- for
the all drugs, minus 2.  All right.  Very well.

           MS. SAN NICOLAS:  And I believe, Your Honor, it's
also the understanding that he has -- he receives the
departure now, the 2-level reduction now, and that he agrees
not to bring it up at a later time.

           THE COURT:  Right.  Let me just make sure,
Mr. Moots, that your client agrees that if it goes into
effect, with or without U.S. Congress approval, right, because
it will go in either way.  It sounds like Congress will do it
or -- I mean, Congress will affirmly [sic] do it or it will
just go in if they do nothing, that's what you're saying,
right?

           MR. MOOTS:  That's correct.

           THE COURT:  So if it goes into effect, is your

```
 1    client agreeing that he will not come back to the Court and

 2    ask for an additional 2 credits?

 3              MR. MOOTS:  That's correct, Your Honor.  Our

 4    reading of that law -- of the retroactive application of it is

 5    that it only is retroactive if the individual did not already

 6    receive it.

 7              THE COURT:  Right.

 8              MR. MOOTS:  So I don't believe he would have, but

 9    we agree that he would have no legal basis for requesting the

10    additional 2-level reduction if the Court grants that now.

11              THE COURT:  Okay.

12              MR. MOOTS:  If it doesn't grant it now, then

13    under the provision, he would then be able to retroactively

14    come back.

15              THE COURT:  Right.

16              MR. MOOTS:  But it's a one-time operation.  If he

17    gets it now, he doesn't get it later.

18              THE COURT:  Okay, very well.  So the Court -- and

19    your client, he understands this?

20              MR. MOOTS:  You understand?

21              THE DEFENDANT:  (Nodded head.)

22              THE COURT:  You understand that, Mr. Calvo?

23              THE DEFENDANT:  Yes, I do, Your Honor.

24              THE COURT:  So basically, you're getting a break

25    here, minus 2 -- another break, based on what the United
```

1  States Sentencing Commission wants to do is give people who

2  have drug offenses extra credit for their crimes because they

3  have a different philosophy now.  They're moving into a

4  different philosophy about people who are on drugs, okay?

5           THE DEFENDANT:  Yes, Your Honor.

6           THE COURT:  So you can't come back and get the 2

7  credits again because you're gonna get it today.  I'm going to

8  give it to you today.

9           THE DEFENDANT:  Thank you, Your Honor.

10           THE COURT:  All right.  Okay, very well.  That

11  will be granted.  And then there's another one you're asking

12  under 3E1.1?

13           MS. SAN NICOLAS:  3E1.1(b), Your Honor.  The

14  government --

15           THE COURT:  B.  Okay.

16           MS. SAN NICOLAS:  Yes, Your Honor.  Government

17  moves for an additional 1 level reduction for acceptance of

18  responsibility.  Defendant Calvo has voluntarily entered into

19  a plea in a timely manner sparing the government, as well as

20  the Court, the expense of resources.  We move for that

21  additional 1 level departure.

22           THE COURT:  Okay, Mr. Moots, I'm sure there are

23  no objections?

24           MR. MOOTS:  No objections.

25           THE COURT:  All right.  Very well.  The Court

1   will grant another credit to Mr. Calvo, 3E1.1(b), because he's

2   pled guilty and proceeded forward without going to trial, so

3   that will be granted.

4           Okay.  So the Court adopts the presentence

5   investigation report with the changes that have been

6   previously made.  And now we'll hear from -- now who's gonna

7   do the -- is it gonna be you Ms. Wonenberg or is it gonna be

8   --

9           OFFICER WONENBERG:  I could do it, Your Honor, if

10  that's okay with you.

11          THE COURT:  No, that's fine with me.  Okay, so

12  now you know what we've done then, right?

13          OFFICER WONENBERG:  Yes, Your Honor.

14          THE COURT:  Adjustment for the role in the

15  offense, acceptance of responsibility, and the minus 2.

16          OFFICER WONENBERG:  Correct.

17          THE COURT:  Okay, go ahead.

18          OFFICER WONENBERG:  Your Honor, the defendant,

19  Kenneth Calvo, was convicted of the attempted possession of

20  methamphetamine with intent to distribute, a violation of

21  Title 21, United States Code Section 846 and 841(a)(1).  This

22  is a maximum of 20 years imprisonment.  A million dollar fine.

23  It's a Class B felony.  The defendant's exposure under the

24  guidelines, based on all of the facts of the offense,

25  including his criminal history, which is a total of 6 points,

1  that places him in Criminal Category III.  His offense level

2  is found under the guidelines under 2D1.1, and the base

3  offense level for that is 34.  He receives no specific offense

4  characteristics, including the removal of the adjustment for

5  role in the offense.

6        So his adjusted offense level -- we are at

7  Paragraph 59, Your Honor, is 34, rather than 36.  He further

8  receives the minus 3 points under Paragraph 61 and 62,

9  pursuant to the guidelines Section 3E1.1, subsection (a) and

10  (b) for acceptance of responsibility and for timely

11  cooperation with the authorities in this case.

12        His total offense level is for the -- reduced by

13  2 levels pursuant to the Amendment 782 for the minus 2 for

14  drug offenses.  Therefore, the defendant's total offense level

15  in this case is 29.  A Criminal Category III.  The defendant's

16  exposure under the guidelines is 108 months to 135 months,

17  Your Honor.  There will be changes to the sentencing options,

18  if you want me to tell you what pages and paragraphs need to

19  be amended.

20        THE COURT:  Okay, I just want to make sure --

21  okay, so he started off at a 34; correct?

22        OFFICER WONENBERG:  Yes.

23        THE COURT:  And then for -- adjustment for role

24  in the offense, this is for the minor role?

25        OFFICER WONENBERG:  Yes.  He doesn't get any

1 reduction, so he remains --

2          THE COURT: Right, right. Okay, he doesn't get

3 any reduction there. That's right. Right. So okay. So he's

4 -- go ahead.

5          OFFICER WONENBERG: So he -- he -- then you just

6 take that 34, that's the base offense level, and you go down

7 to the next paragraph, which is -- well, go down to 59, which

8 is showing 36, but that should be 34.

9          THE COURT: Mm-hmm.

10          OFFICER WONENBERG: And then the Court considered

11 the variance to grant him the minus 2 points for relevant drug

12 offenses, that's the policy.

13          THE COURT: Right.

14          OFFICER WONENBERG: So that would bring this

15 offense level to 32.

16          THE COURT: Right. And then minus --

17          OFFICER WONENBERG: Minus the 3 points -- I'm

18 sorry, I'm going to say minus 2 points first, and then minus

19 additional 1 point, that's 29.

20          THE COURT: Right. Under 3E1.1(a)?

21          OFFICER WONENBERG: Yes.

22          THE COURT: Okay, right. Got it. So he's at 29.

23          OFFICER WONENBERG: Under -- okay, so let me go

24 back to 32, minus 2 is 30. And that minus 2 points is under

25 3E1.1(a).

```
 1                    THE COURT:  Right.

 2                    OFFICER WONENBERG:  Then the -- then, actually,

 3     it's in the presentence report.  He was provided the minus 1

 4     reduction for -- under 3E1.1(b).

 5                    THE COURT:  All right.

 6                    OFFICER WONENBERG:  So the total reduction of

 7     acceptance of responsibility is 3 points.

 8                    THE COURT:  Right, okay.

 9                    OFFICER WONENBERG:  So he's -- he is total

10     offense level is 29.

11                    THE COURT:  Right, okay.  I just wanted -- okay,

12     I got that.

13                    OFFICER WONENBERG:  Right, that's okay.  No, I

14     was calculating all of this already while you were making

15     those decisions here, so...

16                    THE COURT:  Okay.  So he's at level 29?

17                    OFFICER WONENBERG: Yes, Your Honor.

18                    THE COURT:  Okay, so based on level 29, what is

19     the -- let's look at the imprisonment term and the guidelines,

20     what does he face now?

21                    OFFICER WONENBERG:  He's looking at 108 months

22     minimum, and maximum 135 months.

23                    THE COURT:  Okay.  And then statutory term is

24     20 years maximum imprisonment?

25                    OFFICER WONENBERG:  Yes.
```

```
 1                    THE COURT:  Okay.

 2                    OFFICER WONENBERG:  There is no minimum

 3   mandatory.

 4                    THE COURT:  Right.  Okay, so the most that the

 5   Mr. Calvo can face is 20 years in prison or the guidelines of

 6   108 to 135 months?  Okay, what about his supervised release?

 7                    OFFICER WONENBERG:  His supervised release

 8   remains the same, Your Honor, under the sentencing options.

 9   He's looking at a maximum of 3 years supervised release.

10                    THE COURT:  Mm-hmm.  Under the guidelines though?

11                    OFFICER WONENBERG:  The guidelines say that, at

12   least, a minimum of -- hold on just a second.  Of at least 1

13   year up to 3 years.

14                    THE COURT:  Right, okay, got it.  Probation is

15   not authorized?

16                    OFFICER WONENBERG:  Probation is not authorized.

17                    THE COURT:  What is the fine?  What is the

18   statutory fine?

19                    OFFICER WONENBERG:  A million dollars,

20   $1 million.

21                    THE COURT:  Guideline fine amount?

22                    OFFICER WONENBERG:  The guideline for this

23   section is now changed to a minimum of $15,000 --

24                    THE COURT:  Uh-huh.

25                    OFFICER WONENBERG:  -- up to a million dollars,
```

1  Your Honor.

2          THE COURT:  Okay, special assessment is a hundred

3  dollars?

4          OFFICER WONENBERG:  Yes.

5          THE COURT:  And there's no restitution?

6          OFFICER WONENBERG:  Not in this case.

7          THE COURT:  All right.  And so what's the

8  recommendation by probation?

9          OFFICER WONENBERG:  Are you asking my opinion,

10 Your Honor?

11         THE COURT:  Yes, if you --

12         OFFICER WONENBERG:  Okay.  Sure.  Okay.  I

13 believe that this defendant should get the minimum of

14 108 months.  The reason is because of -- I believe that this

15 defendant has cooperated and been truthful all along in -- in

16 -- he's been consistent with his conditions ordered by the

17 Court and he's -- you know, if the Court notices that he's

18 been on release, he's been in compliance with his conditions.

19 And also, the defendant, I believe, that his age is important

20 for him to -- to try to focus on rehabilitation and focus on a

21 life ahead of him that could be better, based on better

22 choices and better decisions.

23         So in line with the Department of Justice and now

24 the Sentencing Commission's idea of maybe more imprisonment is

25 not the key, and maybe focusing on allowing and helping

1  people, such as this defendant, become better citizens.  That

2  might be a good sentence to give him, the minimum of a 108

3  months, and that's already a lot of time in jail, Your Honor.

4              THE COURT:  All right.  How much time has

5  Mr. Calvo served in prison, credit for time served?

6              OFFICER WONENBERG:  I believe it's 72 -- 72 days.

7              THE COURT:  Oh, okay, 72 days.  And since he's

8  been release -- how long has he been released, and I

9  understand that -- you just said that he's tested negative in

10  drugs the entire time he's been out?

11             PROBATION OFFICER:  That's correct, Your Honor.

12             THE COURT:  Okay, so how long?

13             PROBATION OFFICER:  Since December.

14             THE COURT:  Okay, so for --

15             PROBATIONS OFFICER:  Since his release, he's

16  never tested positive.  He's been on location monitoring since

17  then.  And according to Supervision Officer, Steve Guilliott,

18  he's been compliant with those conditions.

19             THE COURT:  For eight months, he's been negative?

20             PROBATION OFFICER:  That's correct.

21             THE COURT:  Okay, very good.  Okay.  All right.

22  Thank you very much, Ms. Wonenberg for being here and for

23  writing your extensive reports.

24             OFFICER WONENBERG:  Thank you, Your Honor.

25             THE COURT:  Okay.  Let me hear from the United

States Attorney, Ms. San Nicolas.  What is your recommendation

for sentence for Mr. Kenneth Calvo?

MS. SAN NICOLAS:  Your Honor, the government

recommends the defendant receive the minimum.  The plea

agreement does have an agreement where we can recommend a term

within the guideline range.  However, Your Honor, we recommend

the minimum of the guidelines of 108 months, I believe that is

9 years.

Your Honor, this is significant time, and we do

note that part of the nature and circumstances of this offense

and that the defendant was very intent on obtaining that

package.  He certainly made these attempts succeed.

We would note, Your Honor, that the defendant

brought the methamphetamine to an apartment and within that

apartment there were 3 children.  We note that those 3

children were there with, apparently, someone who claimed that

she was a babysitter.  But, Your Honor, we believe that the 9

-- the 108 months, the 9 years is an appropriate sentence

given the circumstances, which the Court has heard about.  And

also given the fact that there were children in the residence.

The history --

THE COURT:  The children were pretty young,

weren't they?

MS. SAN NICOLAS:  I believe they were 7 -- they

were all below the age of 10.

1          THE COURT:  Mm-hmm.  The apartment over in

2   Mangilao that they took the package to?  Yeah.  All right.

3          MS. SAN NICOLAS:  Yes, Your Honor, it was

4   University Garden Apartments, I believe it's A113 was the

5   unit.  It was the residence of Christine Lizama and Shawn

6   Lizama, as well as their 3 children.  The residence did have

7   other people there, a babysitter -- a woman who claimed that

8   she was a babysitter, who was an adult, and of course, there

9   was Paul Aguon who was also in the residence.

10          But, Your Honor, the government believes that

11   108 months is appropriate given these circumstances.

12   108 months certainly reflects the seriousness of this offense

13   and will promote respect for the law, as well as protecting

14   the community from activities of this type.  This will

15   certainly deter others who wish to bring drugs to Guam or who

16   wish to distribute drugs on Guam.  The 2-level reduction has

17   been considered and this is a suggestion or a pertinent policy

18   statement issued by the Sentencing Commission that has taken

19   -- been taken into account.

20          The defendant, Your Honor, will be able to avail

21   himself of treatment that the Bureau of Prisons can provide.

22   The government recommends that the minimum be imposed.  That

23   the defendant be ordered to attend the Drug Offender Treatment

24   Program, if he has an interest in completing that program.

25   The defendant be ordered not to possess any firearms upon his

1    release, and that a term of supervised release of 5 years be

2    imposed.  The defendant's offense is very serious.  It --

3    luckily, no children were harmed during this incident.  It did

4    require agents to essentially, raid the apartment where there

5    was a lot of people there, there were drugs, nobody knew what

6    exactly was in that unit until after they were brought out.

7              THE COURT:  Were the children present at the time

8    the warrant was executed?

9              MS. SAN NICOLAS:  They were in the residence,

10   Your Honor.  Special Agent Erf Matanguihan observed them.

11             THE COURT:  Okay.

12             MS. SAN NICOLAS:  However, Your Honor, given the

13   defendant's -- given the circumstances of this offense, the

14   fact that the defendant has pled guilty voluntarily, we do

15   believe that 108 months is appropriate.

16             THE COURT:  Okay.

17             MS. SAN NICOLAS:  Thank you, Your Honor.

18             THE COURT:  Thank you.  Okay, Mr. Moots, you and

19   your client can come up to the podium.  So here are the

20   options, 20 years statutory, 108 minimum and 135 maximum under

21   the guidelines.

22             MR. MOOTS:  Yes, Your Honor.  And we, of course,

23   are joining in the request for the 108 months.

24             THE COURT:  Okay.  Can you bring the mic a little

25   --

1         MR. MOOTS:  Oh, I'm sorry.

2         THE COURT:  Thank you, Mr. Moots.

3         MR. MOOTS:  My client recognizes, and he

4 recognized early on when he entered a plea, that what he'd

5 done was wrong, he knew it was wrong.  Unfortunately, he had

6 several -- I think it would be fair to say, bad years after

7 the disillusionment of his marriage, and he made a lot of bad

8 choices and tried to act a little bit like the rebel or the

9 wild child.  He returned to Guam following the death of his

10 grandparents.  I've only known Mr. Calvo since he was

11 arrested, but I suspect that returning to Guam and getting

12 arrested may have saved his life.

13         The people behind you, this entire courtroom are

14 all relatives of Mr. Calvo's who've come to support him.  And

15 I would -- don't think I would be off base in saying that it's

16 because of the folks behind us and the strong family that he

17 has here, that he's been successful the 8 months that he's

18 been on.  I think he's learned that he has a lot to live for.

19 He has a lot going for him.  That he now -- he realizes he has

20 a responsibility to a lot of people other than just himself.

21 And it's unfortunate sometimes that it takes traumatic events,

22 such as getting arrested and being involved in this type of a

23 situation for somebody to realize how much they have.

24         I think Mr. Calvo had almost given up a little

25 bit on things because things had not worked out, and he was

not having contact with his son, and his ex-wife is in Texas with his child and he sort of thought he was on his own and I think that the situation has changed that.

So I agree with the government that there is no real need for incarceration beyond the minimum, that he will be punished sufficiently by the 9 years in custody, and I think that when he gets out, he understands that there's a lot of people counting on him. There's his son, who he wants to be out before he graduates and he'll tell you about that. He realizes that this whole courtroom full of people back here of a multitude of ages, are all counting on him when he gets out. That they all care for him and that they love him and that they're there for him and that he doesn't have to go out on his own, that he's not the rebel without a cause, he's not, you know, the sort of the lone ranger that I think he was feeling.

When I first met him, he was a bit of an angry young man and there's been a huge change in him over the last 8 months. To be honest, when I first met him, he was not that pleasant to spend time with. I'm sure the marshals will tell you that. Now, I enjoy sitting and talking to him, he's a very intelligent young man. He's got a lot going for him. He's got a lot of skills, I mean, he was a -- he had a trade.

But unfortunately, when things went wrong he made a bunch of bad choices that led him to this situation, and I

1  think the 108 months would be sufficient punishment, and I

2  don't think that when we're all done, when that time is over,

3  that Mr. Calvo will ever be part of the criminal justice

4  system again.  I think he'll be on the straight and narrow and

5  he'll be better, but that's just my experience with him.

6          THE COURT:  Thank you, Mr. Moots.  Kenneth Calvo,

7  do you want to say anything before the Court pronounces

8  sentence?

9          THE DEFENDANT:  Yeah, I want to just say to my

10  family that I'm sorry and (crying) being there for me, and

11  just be strong.  And...Your Honor, I know what I did was

12  wrong.  I knew what my role was and I don't think the

13  prosecutors were very wrong about me.  They were, you know,

14  back then, you know in October, I was that guy.  But all I

15  have to do now is just look forward, I just want to get it all

16  behind me.  Get everything in the past, in the past and move

17  forward.  That's it.

18          THE COURT:  You think that the last 8 months have

19  been a changing time for you?

20          THE DEFENDANT:  In the right way, yes.  It's

21  helped me a lot, knowing that I have good family.

22          THE COURT:  You do.  Sometimes I have defendants,

23  which is rare that -- I mean, you don't think that would

24  happen on Guam, but sometimes we have defendants that come in

25  with no family member.  You know, I know who your parents are.

1   I mean, I don't know them very well but I know of them.  You

2   know, we knew you when you were growing up.  You were a good

3   baseball player, you come from a very good family and you

4   know, just somehow along the way you got off track here.

5            THE DEFENDANT:  Yeah.  When I loss my son and my

6   -- my son's mom, I thought I lost everything so I didn't care,

7   you know?  I just went, like you said, I just went on a tear

8   [sic], I went into drugs, alcohol.  And... getting caught now

9   is probably the best thing that ever happened to me.  And my

10  son is 9 years old.  And that 9 years, you know, that 9 years

11  I'll be there, I at least, get a chance to see him graduate so

12  I'm happy for that.

13           THE COURT:  Mm-hmm.  Could be earlier.

14           THE DEFENDANT:  Yes.

15           THE COURT:  You get credit for time served.  You

16  get credit for -- when you're in federal prison, you get

17  credit for good time served and you also get credit for

18  successfully getting through the drug treatment program.  I

19  think you get -- it's a year credit, I believe.

20           MR. MOOTS:  I believe it's a year, yes, Your

21  Honor.

22           THE COURT:  Yeah, a year credit.  So okay,

23  Kenneth, so well, as I indicated to you and your attorney,

24  Mr. Moots, right before he came on -- came up to speak with

25  you, you did face -- you see the sentence you face, you could

```
 1   have faced 20 years imprisonment.  That's a long period of
 2   time.  You're a young man.  I'm sorry, are you 29?
 3                   THE DEFENDANT:  Just turned 30 in August.
 4                   THE COURT:  You just turned 30.  So you're very
 5   young.  You still got your life ahead of you.  But under the
 6   guidelines, it's 108 to 135.  The U.S. Attorney, Ms. San
 7   Nicolas, is recommending the minimum sentence, so is
 8   probation, and Court agrees with that.  I'll sentence you to
 9   the minimum sentence after having heard the statements of the
10   U.S. Attorney, your attorney, Mr. Moots, and having heard your
11   statement to me, and having read the presentence report.  So I
12   will commit you to the Bureau of Prisons for a period of the
13   108 months, a special assessment of $100 is mandatory and due
14   immediately.
15                   Because of your financial situation, I'm not
16   gonna order a fine, okay?  And the supervised release term,
17   according to the U.S. Probation Officer, is -- I see 3 years
18   maximum, so I will impose a term of 3 years supervised release
19   after you get out of prison.  So let me just ask you, while
20   you're in prison, is there a request for judicial
21   recommendation, number one, that he enter a drug treatment
22   program?
23                   MR. MOOTS:  Yes, Your Honor.
24                   THE COURT:  So the Court will make a judicial
25   recommendation that you enter into a drug treatment program.
```

1  Is there a request that Mr. Calvo serve his term in like,

2  California or any other jurisdiction?

3          MR. MOOTS:  He doesn't have any preference.  His

4  child, I believe, is in Texas, but I think he's too young

5  probably to visit.  So I don't believe he has a lot of family

6  in the mainland.

7          THE DEFENDANT:  California, Texas.  I have family

8  in California, Texas, and Washington.

9          THE COURT:  So you want me to make a

10 recommendation to any one of those places?

11         MR. MOOTS:  Any one those 3 states will be fine.

12         THE COURT:  So California, Texas or Washington

13 State?

14         MR. MOOTS:  Washington State, yes, Your Honor.

15         THE COURT:  And in particular, to make sure that

16 any one of those jurisdictions has a drug treatment program.

17         MR. MOOTS:  Yes, Your Honor, that would be our --

18 the biggest preference would be the drug treatment program.

19         THE COURT:  Okay.

20         MR. MOOTS:  And then location would be a second.

21         THE COURT:  Okay.  I'll make sure we include that

22 in the judgment.  And then, is there any other recommendation

23 for any other type of treatment or training and so forth?

24         MR. MOOTS:  Not that I -- not that I can think of

25 at this moment, Your Honor.  He's already got an actual trade

```
 1   out there, he was installing electronics.

 2              THE DEFENDANT:  Cell phone towers.

 3              MR. MOOTS:  Cell phone towers and things like

 4   that.  So he's got skills, like I said, he's an intelligent

 5   young man.  He's not gonna have any trouble.

 6              THE COURT:  Okay, very well.  And so that will be

 7   the Court's judicial recommendations.  Then when you get out

 8   of prison, Mr. Calvo, I'm gonna order that you not commit

 9   another federal, state or local crime.  In other words, stay

10   clean.  Understand?

11              THE DEFENDANT:  Yes, Your Honor.

12              THE COURT:  You shall not unlawfully possess a

13   controlled substance and you must refrain from any unlawful

14   use of a controlled substance.  Submit one drug test upon

15   15 days of -- after release from imprisonment and 2 or more

16   drug tests thereafter, do you understand?

17              THE DEFENDANT:  Yes, Your Honor.

18              THE COURT:  You must submit to the collection of

19   a DNA sample at the direction of U.S. Probation, comply with

20   the standard conditions of supervised release as adopted by

21   the Court, and you may not possess a firearm or other

22   dangerous weapon as defined by federal, state or local law.

23   Do you understand?

24              THE DEFENDANT:  Yes, Your Honor.

25              THE COURT:  You must participate in a substance
```

```
1   treatment program approved by the U.S. Probation, which may
2   include up to 8 drug tests a month for the use of drugs or
3   alcohol, and you must make co-payment for the program at a
4   rate to be determined by U.S. Probation.  You must refrain
5   from the use of all alcohol beverages and be subjected to
6   alcohol testing and you must perform 50 hours of community
7   service.  It will be suspended if you are gainfully employed.
8   Do you understand?
9              THE DEFENDANT:  Yes, Your Honor.
10             THE COURT:  Now, prosecution, I think the
11  defendant pled to an information, did you wish to dismiss the
12  indictment?
13             MS. SAN NICOLAS:  Yes, Your Honor.  We move to
14  dismiss the indictment.
15             THE COURT:  All right.  Mr. Calvo, the Court
16  finds that the sentence today, the minimum sentence of
17  108 months, takes into consideration the factor set forth
18  under 18 U.S.C. 3553(a) and achieves the general purposes of
19  sentencing, including consideration of the advisory
20  non-binding sentencing guidelines.  So I've looked at the
21  nature and circumstances of the offense, I mean, it was a very
22  -- as you know, very serious offense.  And the thing that is
23  always of concern is number one, what hurts you is you have a
24  criminal history category, so your prior convictions really
25  hurt you.  That's why you're up to 108 months.  And so -- and
```

1  then also what hurts you is with regard to this case is -- and

2  I tell you this just so that you won't forget it and you'll

3  stay on track, is that there were 3 children in this

4  apartment, 6, 7, and 12 years old.  Those are the ages of your

5  child -- your son, right?  Is that what you said, a son?

6              THE DEFENDANT:  Yes, Your Honor.

7              THE COURT:  You don't -- you know, the worst

8  thing to do is have somebody bring drugs into the home where

9  children are.  Now I know those are Lizama's kids, right?

10             THE DEFENDANT:  Yes, Your Honor.

11             THE COURT:  Well, Mr. Lizama was also involved in

12  drugs, so he, I'm sure will be prosecuted if he's not already

13  been prosecuted for that, he and his wife.  And so that really

14  hurt as well.  And then all of the other factors that Ms. San

15  Nicolas went through in terms of you trying to get the drugs

16  and, you know, entering into this distribution and so forth.

17  But, so the Court looks at the nature and circumstances of the

18  offense, the history of yourself as I've indicated, and the

19  sentence has to reflect the seriousness of the offense and to

20  ensure that it promotes respect for the law and I think this

21  sentence does.  And does it provide judgment punishment, I

22  think it does, too, with regard to your remorsefulness and the

23  fact that I think you are getting on a good track.  The fact

24  that you've been drug free and clean for 8 months says a lot

25  about your commitment to trying to really get back on track

1  and show your son that you could be an example, a better

2  example to him, a role model, if at all, okay?

3                THE DEFENDANT:  Yes, Your Honor.

4                THE COURT:  Just work hard at that.  You know, we

5  all make mistakes in life and if you can just continue to work

6  closely on trying to succeed in all of the milestones that you

7  need to succeed in before you are released, and then you get

8  to see your son.  Hopefully, you can get to see your son

9  before that.  There's never -- I mean, there's a possibility

10  that could happen, I'm not sure how, but you could always work

11  on that, okay?

12                Okay.  And then the Court has to also ensure that

13  there's adequate deterrence to criminal conduct, has been

14  provided when I issue the sentence, which I believe it has.

15  And the Court has already indicated that it will make a

16  judicial recommendation regarding treatment towards you, and

17  the Court also looks at sentencing disparities to make sure

18  that your sentence is consistent with other sentences, which I

19  believe it is.  And so under 3553(a), the Court believes that

20  the general purposes are -- of sentencing are achieved.  The

21  Court finds that the sentence is greater -- is within an

22  advisory guideline range that is greater than 24 months.  And

23  the Court does not find that there's any reason to depart from

24  the sentencing guideline range.

25                Let me just make sure -- in your plea agreement

1   you waived your right to appeal your conviction, you have the

2   right to appeal the sentence and judgment of this Court, Mr.

3   Calvo.  Your notice of appeal must be filed within 14 days of

4   entry of judgment.  If you're unable to pay the cost of an

5   appeal, you may apply to file for a free appeal.  And if you

6   request, the clerk will prepare and file a notice of appeal on

7   your behalf.  I'm also advising you that if you can't afford

8   an attorney to handle your appeal, one will be appointed to

9   represent you.  Let me clarify, the indictment dismissal is as

10   to Kenneth Calvo only; is that correct?

11          MS. SAN NICOLAS:  Yes, Your Honor, that is

12   correct.

13          THE COURT:  Okay, I just wanted to clear that up.

14   Do you have any questions, Kenneth?

15          THE DEFENDANT:  No, Your Honor.

16          THE COURT:  Okay.  Well, you know, be grateful

17   that you have your family here.  Like your attorney said,

18   maybe all of these 8 months and probably even before that, I

19   know that, but the last 8 months where they've been there to

20   help you, you know, make them proud and just go in and

21   continue to work hard on staying sober, staying clean, and

22   getting your life in order, okay?

23          THE DEFENDANT:  Yes, Your Honor.

24          THE COURT:  Now with regard to his -- do you want

25   him to self-surrender?

Case 1:13-cr-00063   Document 113   Filed 03/28/19   Page 63 of 68

1          MR. MOOTS:  He was asking if he could

2    self-surrender next Friday?

3          THE DEFENDANT:  Next Friday or Saturday?

4          THE COURT:  Well, I think he can -- he'll -- no,

5    not, not next Friday.  I think the U.S. Marshals have to get

6    word from the U.S. Federal Bureau of Prisons, so what they'll

7    do is they'll receive word that he's been designated, so it

8    could be -- I don't know, sometimes it like -- takes 1 week,

9    2 weeks, 3 weeks.  So he could be out long --

10          MR. MOOTS:  Yes, he'd like to self-surrender and

11    he'll report whenever the marshals contact him.

12          THE COURT:  All right.  No objections then?

13          PROBATION OFFICER:  No objections, Your Honor.

14          THE COURT:  Ms. San Nicolas?

15          MS. SAN NICOLAS:  No objections, Your Honor.

16          MR. MOOTS:  He'll continue on the ankle

17    monitoring and -- that he's already on now.

18          THE COURT:  Okay.  Thank you, Mr. Moots.  All

19    right.  So let me just say, Kenneth, because you have been

20    very clean and there's no reason to believe that you're going

21    to violate any of the conditions of the release, the Court

22    will go ahead and let you go.  You can self-surrender once the

23    marshals indicate, they'll call you -- will they call you or

24    would -- probation will call?  Marshals will call, okay.

25    Marshals have indicated that they will call you directly to

1  tell you once you've been designated, and then you will

2  coordinate that with them.

3              THE DEFENDANT:  All right.

4              THE COURT:  To appear, okay?

5              THE DEFENDANT:  Yes, Your Honor.

6              THE COURT:  All right.  Any questions?

7              MR. MOOTS:  None from us, Your Honor.

8              THE COURT:  Okay, good luck to you.

9              OFFICER WONENBERG:  I do have a question, Your

10 Honor.

11             THE COURT:  Yes?

12             OFFICER WONENBERG:  The defendant will -- will he

13 continue to comply to -- or with conditions of his pretrial

14 release while -- before?

15             THE COURT:  Yeah.

16             OFFICER WONENBERG:  Okay.

17             THE COURT:  Yeah, Mr. Moots -- yeah, he just

18 indicate to me -- yeah, he reminded me but I forgot to state

19 that on the record.  So all your conditions of release,

20 Kenneth, follow that -- you know, all the conditions that

21 you've been on, just continue to follow that, okay?

22             THE DEFENDANT:  I will, Your Honor.

23             THE COURT:  All right.

24             OFFICER WONENBERG:  And also, Your Honor, his

25 passport, if you can order that that be released back to him?

1          THE COURT:  Do we have his passport?  Do we have

2   your passport?

3          THE DEFENDANT:  Yes, Your Honor.

4          AGENT:  HSI has his passport, Your Honor.

5          THE COURT:  Who does?

6          AGENT:  HSI, our agency has his passport.

7          THE COURT:  Okay.

8          PROBATION OFFICER:  We could release it to

9   probation or marshals?

10          OFFICER WONENBERG:  In this case, I believe that

11   it would be best to release it to the defendant.

12          THE COURT:  Oh, okay.  Can do you that, HS -- I

13   mean, can you do that?

14          AGENT:  Yes, Your Honor.  We'll release it to the

15   defendant.

16          THE COURT:  Well, you could -- you could --

17          MR. MOOTS:  I'm working with them and they can --

18   the last time, they released material to me and I can

19   coordinate with Mr. Calvo's family.

20          THE COURT:  Okay, why don't --

21          MR. MOOTS:  Because of his ankle --

22          THE COURT:  Right.

23          MR. MOOTS:  -- the release conditions -- it's a

24   bit of a time constraint to try to contact probation to make

25   arrangements, so what I'll do is I'll make arrangements with

1    the investigators, they can bring it to me and then if I don't

2    get it to Kenneth himself, I'll get it to his parents.

3                    THE COURT:  All right.  Very well.  So, yeah,

4    take care of that.  Just coordinate that with Mr. Moots then.

5                    AGENT:  Yes, Your Honor.

6                    THE COURT:  Can you do that?  I appreciate it.

7                    OFFICER WONENBERG:  Thank you, Your Honor.

8                    THE COURT:  Thank you for doing that.  All right.

9    Good luck to you and in about a year from now, I want you to

10   write me a letter and tell me how you're doing.

11                   THE DEFENDANT:  I will, Your Honor.

12                   THE COURT:  Tell me how you're doing in prison

13   and how you're doing in your treatment program.  I ask my

14   defendants to do that once they're out.

15                   THE DEFENDANT:  I will, I will.

16                   THE COURT:  I want to keep track of you and just

17   see how everything is going, okay?

18                   THE DEFENDANT:  All right, Your Honor.  Thank

19   you.

20                   THE COURT:  All right.  Good luck to you.  Thank

21   you.  Okay, you're hereby released.  Thank you.

22                   (Proceedings concluded at 3:57 p.m.)

23                              *  *  *

24

25

CERTIFICATE OF OFFICIAL REPORTER

CITY OF HAGATNA      )
                     )  ss.
TERRITORY OF GUAM    )

I, Veronica F. Flores, Official Court Reporter for the United States District Court of Guam, do hereby certify the foregoing pages, 1 to 67, to be a true and correct transcript of the proceedings held in the above-entitled matter.

Dated this 28th day of March, 2019.

/s/Veronica F. Flores
Veronica F. Flores